UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| SPENCER RUDA,<br><br>Plaintiff,<br><br>v.<br><br>USI INSURANCE SERVICES, LLC<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:25-cv-00543-JAW |

**ORDER ON MOTION TO DISMISS**

The court concludes an employee has survived the employer's motion to dismiss his Maine Whistleblower Protection Act claim, but the employee has failed to demonstrate he gave notice of his claims of discrimination within 300 days of the discriminatory acts, as required by state and federal law and therefore his discrimination claims must be dismissd.

## I. BACKGROUND

On October 28, 2025, Spencer Ruda filed a complaint against his former employer, USI Insurance Services, LLC (USI), alleging that his termination from employment violated the Maine Whistleblower Protection Act (WPA), 26 M.R.S. §§ 831 et seq., violated the prohibition against religious discrimination in Title VII, 42 U.S.C. §§ 2000e. et seq., violated the prohibition against national origin discrimination in Title VII (hostile work environment), 42 U.S.C. §§ 2000e. et seq., and violated the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4571 et seq. *Pl.'s Compl. and Demand for Jury Trial* (ECF No. 1) (*Compl.*). On January 9, 2026, USI filed a motion to dismiss. *Def.'s Mot. to Dismiss* (ECF No. 5). On January 30, 2026,

Mr. Ruda filed his response. *Pl.'s Opp'n to Def.'s Mot. to Dismiss* (ECF No. 6) (*Pl.'s Opp'n*). On February 10, 2026, USI filed its reply. *Def.'s Reply in Support of its Mot. to Dismiss* (ECF No. 7) (*Def.'s Reply*).

## II. THE ALLEGATIONS IN THE COMPLAINT

### A. The Parties

Spencer Ruda currently lives in Tampa, Florida and formerly lived in Portland, Maine. *Compl.* ¶ 3. USI is a limited liability company with a principal place of business in Valhalla, New York. *Id.* ¶ 4.

### B. USI Hires Spencer Ruda Subject to a Non-Solicitation Agreement: May 15, 2023

On May 15, 2023, Mr. Ruda began working for USI as an employee benefits (EB) producer, selling insurance for USI. *Id.* ¶ 10. Mr. Ruda's direct supervisor was Burr Duryee, the New England EB Practice Leader. *Id.* ¶ 13. USI offered Mr. Ruda a job paying $125,000 per year, beginning May 14, 2023. *Id.* ¶ 14. At the time, Mr. Ruda had a job at Varney Agency, where he had a non-solicitation agreement. *Id.* Mr. Ruda's understanding was that for the first year, his salary was entirely expensed to the URI home office in South Portland, Maine; however, after one year, he became more expensive for Mr. Duryee's division. *Id.* ¶ 16. Although he is not aware of the precise arrangement, after his first year, he believes that Mr. Duryee's division paid 75% of his salary and the corporate office the remaining 25%. *Id.* ¶¶ 16-17. Regardless of the precise arrangement, Mr. Ruda believes that he became more expensive for Mr. Duryee's division after one year. *Id.* ¶ 17. USI was intentionally

vague about this internal financial relationship and about his performance benchmarks, which also changed periodically. *Id.* ¶ 18.

### C. Spencer Ruda Goes on the Clock and is Pressured to Reveal Varney Client Lists: July 1, 2023

Mr. Ruda was not expected to produce EB sales during the first month of employment, and he went "on the clock" on July 1, 2023, and thereafter was expected to obtain four appointments per week with employers who might purchase USI's EB plans. *Id.* ¶¶ 19-20. USI gave Mr. Ruda a list of 200 companies who might purchase one of its EB plans. *Id.* ¶ 19. Beginning July 1, 2023, Mr. Ruda fulfilled his obligation to secure four appointments per week with potential customers. *Id.* ¶ 20.

Once Mr. Ruda went on the clock, Mr. Duryee asked him to write down the list of the clients he had served at Varney. *Id.* ¶ 21. Mr. Ruda had a non-solicitation agreement with Varney and worried that doing so would violate the agreement because the agreement meant that neither he nor Mr. Duryee could contact the Varney clients. *Id.* Mr. Ruda refused to provide the list of Varney clients to Mr. Duryee, and in response, Mr. Duryee informed Mr. Ruda that his non-solicitation agreement with Varney was unenforceable. *Id.* ¶¶ 21-22. In response, Mr. Ruda told Mr. Duryee that he thought it would be illegal for him to violate the non-solicitation agreement by giving him the names of his Varney customers. *Id.* ¶ 22.

Every Friday, Mr. Ruda would meet one-on-one with Mr. Duryee, and during nearly every one of those meetings right up to Mr. Ruda's termination, Mr. Duryee would repeat his demand that Mr. Ruda write down the names of his Varney clients, and when Mr. Ruda refused, Mr. Duryee told Mr. Ruda that he could fire him. *Id.*

¶¶ 23-24. On one occasion, Mr. Duryee specifically said to Mr. Ruda, "write down your client and I'll call them, I can't get sued." Mr. Ruda told him, "It sounds illegal to me." *Id.* ¶ 25.

**D. Burr Duryee Becomes Increasingly Hostile and Retaliatory**

Mr. Duryee became increasingly hostile and retaliatory toward Mr. Ruda as the months went on and as Mr. Ruda refused to violate his non-solicitation agreement. *Id.* ¶ 26. Mr. Duryee demonstrated no interest in having Ruda develop leads or complete sales. *Id.* Mr. Duryee often prevented Mr. Ruda from attending client meetings in person, which made no sense because it was the only way Mr. Ruda could make sales. *Id.* ¶ 27. When Mr. Duryee attended client meetings with Mr. Ruda, Mr. Duryee did 95% of the talking and said unhelpful things such as: "we can't save you money." *Id.* ¶ 28. Mr. Duryee directly interfered with Mr. Ruda's ability to get leads and sales, and if Mr. Ruda spoke at a client meeting, Mr. Duryee would yell at him in a completely hostile and unprofessional manner. *Id.* ¶ 29.

**E. Conflict over a Former Varney Client: November 2023**

Mr. Ruda went to a meeting with Mr. Duryee for a potential client with the initials PAF. *Id.* ¶ 30. Mr. Ruda did not know that PAF was a Varney customer, because they did not work with Mr. Ruda at Varney but instead a colleague of his. *Id.* Mr. Duryee asked Mr. Ruda to call on this customer after the meeting and tell them he used to work at Varney. *Id.* Mr. Ruda refused, reiterating that he thought it would violate the non-solicitation agreement. *Id.* After above denial to call on the PAF customer, Mr. Duryee further retaliated against Mr. Ruda and took even more egregious steps to prevent him from being successful or achieving sales at USI. *Id.*

¶ 31. On November 17, 2023, Mr. Ruda emailed Mr. Duryee and his boss, Joe Nigro, stating: "Hey Burr and Joe, Burr and I talked about my non solicit today. Joe I know you had our legal team look into my non solicit. We have recently run into a decent sized prospect that I was unaware a client of my former company but had no personal experience with. I believe it was your understanding that I could solicit any clients that I had no direct contact with at Varney. The wording doesn't seem that way in the agreement it seems to say that any one under the Varney umbrella I can't solicit." *Id.* ¶ 32. No one at USI responded to Mr. Ruda's email. *Id.*

### F. USI Sets Up Spencer Ruda to Fail

Once USI realized that Mr. Duryee's demands for client names were not working, because Mr. Ruda refused to break the law, USI set Mr. Ruda up to fail. *Id.* ¶ 34. The company actively interfered with Ruda's ability to complete any sales at all, so that USI could have a pretextual basis for firing Ruda. *Id.* At one point, Mr. Duryee also told Mr. Ruda that he had to share 50% of his commissions with Mr. Duryee, and upon information and belief, Mr. Duryee also forced another employee named Leanna to share commission with him, which she complained about. *Id.* ¶¶ 35-36.

### G. USI Places Spencer Ruda on a Performance Improvement Plan

The final instance of whistleblower retaliation occurred when Mr. Duryee convinced USI to place Mr. Ruda on a false and pretextual Performance Improvement Plan (PIP) in May of 2024, after all of his repeated attempts to have Mr. Ruda steal clients from Varney failed, ultimately leading to Mr. Ruda's termination. *Id.* ¶ 39. On Friday, May 10, 2024, USI presented Mr. Ruda with a false and pretextual PIP. *Id.*

¶ 40. USI claimed that Mr. Ruda was not producing, but in an email dated February 15, 2024, a USI employee named Caroline Porell confirmed that "the sales goal for new producers" at USI was "$25k in 18 months." *Id.* Mr. Ruda had only been at USI for a year by the time he was given this PIP. *Id.* Mr. Ruda alleges that the PIP was intended to get him to quit, not to improve performance. *Id.* ¶ 41. During the meeting on May 10, 2024, Mr. Duryee said to Mr. Ruda, "you don't seem to want to be here." *Id.*

Mr. Ruda declined to sign the PIP on May 10, 2024, because he disagreed with its contents. *Id.* ¶ 42. USI's policies require new producers to have a book of business that equals or exceeds 4 times their base salary but not until they have been working at USI for four years. *Id.* ¶ 43. The PIP that USI placed Mr. Ruda on was false and pretextual because it claimed in the first paragraph that he was expected to have a book of business that was four times his base salary, but that benchmark is not required until year four (not year one). *Id.* ¶ 44. USI told Mr. Ruda to think about the PIP over the weekend and let them know on Monday if he still refused to sign it. *Id.* ¶ 45. When Mr. Ruda went to work on Monday, May 13, 2024, USI told him that he had been "too combative" in the meeting on Friday. *Id.* ¶ 46.

### H. USI Fires Spencer Ruda: May 15, 2024

USI fired Mr. Ruda with an effective date of May 15, 2024 – exactly one year after his hire date. *Id.* ¶¶ 46, 48. The timing of Mr. Ruda's termination on May 15, 2024 coincided with the date when the office Mr. Duryee managed—South Portland—would start having Mr. Ruda's salary be attributed with his budget or treated as an expense of the office Mr. Duryee managed, which upon information and belief

impacted Mr. Duryee's compensation. *Id.* ¶ 48. Upon information and belief, the above one-year mark and compensation impact on Mr. Duryee was the reason why he was so determined to steal Mr. Ruda's book of business when he began working for USI. *Id.* ¶ 49. Upon information and belief, Mr. Duryee was also the only manager in the company who was also a producer earning a commission, which placed him in a direct conflict position. *Id.* ¶ 50. From Mr. Ruda's observations, USI's business model seemed focused not on creating new leads and encouraging EB producers to be successful, but instead to steal clients of existing insurance companies by hiring their employees and applying pressure until they disclose client lists. *Id.* ¶ 52.

### I. Allegations of Antisemitism at USI

Mr. Ruda is Jewish. *Id.* ¶ 54. His religion allows for a birthright trip to Israel, which is a free ten-day trip for adults of Jewish heritage between the ages of 18 and 26. *Id.* Mr. Ruda was scheduled to go on his birthright trip over New Years in 2023-2024, and he was talking with some employees about this trip and Mr. Duryee overheard him. *Id.* ¶ 55. After Hamas attacked Israel on October 7, 2023, killing multiple civilians at a music festival, Mr. Ruda told his USI colleagues that he had already gotten tickets for his birthright trip. *Id.* ¶ 56. Mr. Duryee said he did not understand why anyone would want to go to Israel, even though Mr. Duryee knew that this was a birthright trip for Ruda. *Id.* Mr. Duryee said in Mr. Ruda's presence, "my Egyptian friend said they [meaning Israelis] deserved to die," because they had been "fucking over" Palestinians "for centuries." *Id.* ¶ 57. Mr. Ruda responded to

Duryee that he did not think innocent civilians deserved to die at a music festival. *Id.* ¶ 58.

Mr. Ruda felt that Mr. Duryee's comments about Israel, knowing that Mr. Ruda was Jewish and planning to visit the region, were intentionally demeaning, objectively and subjectively outrageous, offensive, and deeply humiliating in front of Mr. Ruda's colleagues. *Id.* Shortly after the October 7, 2023 attack on Israel, and in close temporal proximity to when Mr. Ruda disclosed he was taking a trip to Israel, Mr. Duryee reached out to New England Regional Sales Manager Marybeth LaFauci to ensure that she included Mr. Ruda on a list of employees not on target to meet certain requirements. *Id.* ¶ 59. Before the MHRC, USI argued that Ms. LaFauci identified Mr. Ruda as being one of the producers flagged on this list in emails dated October 20, 2023. *Id.* ¶ 60. However, the email chain reveals that Mr. Duryee, not Ms. LaFauci, was the one who recommended that Mr. Ruda be added to this list of "flagged" employees. *Id.* From that point forward, and in close temporal proximity to Mr. Duryee's learning of Mr. Ruda's trip to Israel, Mr. Duryee made repeated, escalating efforts to force Mr. Ruda out of USI. *Id.*

## III. THE POSITIONS OF THE PARTIES

### A. USI's Motion to Dismiss

USI says that Count One must fail because the MWPA does not cover disputes about the proper interpretation of an employment contract. *Def.'s Mot.* at 3-6. USI writes that "[h]ere, at the most fundamental level, Count I is based on Plaintiff's belief that either his or USI's actions would violate the private contract he signed with his previous employer. Even if USI had requested Plaintiff to breach a private

contractual agreement, which USI categorically denies, it still would not give rise to a claim under the MWPA as a matter of law." *Id.* at 5. USI rejects Mr. Ruda's attempts to allege that the contractual violation would amount to a violation of law, noting the admonition against relying on labels and conclusions in the place of facts. *Id.*

As for the other claims, USI says they must be dismissed as untimely. *Id.* at 6-8. USI notes that Mr. Ruda filed his Maine Human Rights Commission (MHRC) complaint on January 27, 2025. *Id.* at 6 (citing *Compl.* ¶ 7). USI observes that both the MHRA and Title VII require that a charge of discrimination be filed within 300 days after the alleged discriminatory act. *Id.* (citing 5 M.R.S. § 4611 and 42 U.S.C. § 2000e-5(e)(1)). By USI's calculation, the operative limitations period cut off is April 2, 2024. *Id.* USI concludes that "setting aside the myriad other legal deficiencies of this claim, at this posture the fatal defect for Plaintiff is that a comment in October 2023 cannot support a claim filed more than 300 days after that alleged discriminatory conduct." *Id.*

USI concedes that Mr. Ruda alleges a continuing violation, which could escape the temporal strictures of the statute, but again, USI contends that the "Complaint does not, however, allege any facts to salvage these claims based on the continuing violation theory." *Id.*

### B. Spencer Ruda's Response

In response, Mr. Ruda says that where the employer's violation of an employment contract also constitutes a violation of law, the MWPA applies. *Pl.'s*

*Opp'n* at 1-14. Here, Mr. Ruda points to Maine's misappropriation of trade secrets statute, 10 M.R.S. § 1543, and the Federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1839(3)-(6), as the laws USI was directing Mr. Ruda to violate to gain access to Varney's trade secret information. *Id.* at 6-7. Mr. Ruda argues that USI has not cited any precedent that the state or federal law must be a criminal statute and offers caselaw that includes civil violations within MWPA's ambit. *Id.* at 7. Mr. Ruda then distinguishes USI's caselaw as inapplicable to this situation. *Id.* at 8-10.

Regarding the timeliness issue, Mr. Ruda argues that his claims did not become ripe until they blossomed into an injury that would allow a claim to be initiated, which in his view was not until May 24, 2024 when he was terminated. *Id.* at 10-12.

**C. USI's Reply**

USI replies that Mr. Ruda seeks to "(1) ignore settled Maine law to invent a new category of claim under the MWPA and (2) to extend the deadline for filing a charge of discrimination indefinitely, provided termination occurred less than 300 days before a charge is filed." *Def.'s Reply* at 1. USI reiterates its view that the MWPA "covers the disclosure of illegal activity, not the interpretations of private contractual agreements." *Id.* USI disputes the notion that it would have been illegal for Mr. Ruda to reveal the identity of Varney's clients, since that information is otherwise publicly available; instead, the nonsolicitation agreement restricted only his solicitation of Varney clients. *Id.* at 2-3.

Regarding the timeliness of the claim, USI restates its contention that Mr. Duryee's comment in October 2023 cannot be deemed related to his termination in May 2024 and that Mr. Ruda has failed to allege facts that would support his allegation of a continuing violation. *Id.* at 4-6. Under Mr. Ruda's theory, a distant comment would still be actionable so long as the employee could claim that it caused a much later punitive action, thereby eviscerating the 300-day notice requirement. *Id.* USI also accuses Mr. Ruda of mixing legal theories to try and salvage his claim. *Id.*

## IV. LEGAL STANDARD

For a complaint to survive a motion to dismiss under Rule 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570(2007)). Plausible means "something more than merely possible" or "merely consistent with a defendant's liability." *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (quotation marks and citations omitted) (first quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012), and then quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). Although this does not require "detailed factual allegations," the facts pleaded must at least "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Thus, a facially plausible complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, dismissal is appropriate if a complaint's well-pleaded facts do not "possess enough

heft to 'sho[w] that [the plaintiff] is entitled to relief.'" *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (first alteration in original) (quoting *Twombly*, 550 U.S. at 557).

Assessing a complaint's plausibility is a context-specific task that requires "the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In the First Circuit, district courts apply a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P. R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

"Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (*en banc*) (citing *Twombly*, 550 U.S. at 555).

## V. DISCUSSION

### A. MWPA Claim

Although the parties express sharp disagreement about the propriety of Mr. Ruda's MWPA claim, it strikes the Court that they agree more than disagree. It has been Maine law that the simple breach of contract does not alone provide a basis for a MWPA claim. *Lee v. Town of Denmark*, 2019 ME 54, ¶ 10, 206 A.3d 907; *Galouch v. Dept of Prof. & Fin. Reg.*, 2015 ME 44, ¶ 14, 114 A.3d 988; *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 11, 13 A.3d 773. Yet, it is equally clear that if an employee reported to his employer activity within employment that he had reasonable cause to believe was unlawful, the fact the activity had taken place within the context of an employment contract would not bar the MWPA claim. *Galouch*, 2015 ME 55, ¶ 14, 114 A.3d 988; *Lee*, 2019 ME 54, ¶ 4, 206 A.3d 907; *Stewart-Dore*, 2011 ME 26, ¶ 2, 13 A.3d 773. Indeed, an alleged breach of an employment contract between an MWPA plaintiff and defendant typically forms the critical breakpoint in the employment relationship that precipitated the lawsuit.[1] *Lee*, 2019 ME 54, ¶ 4, 206 A.3d 907; 114 A.3d 988; *Stewart-Dore*, 2011 ME 26, ¶ 2, 13 A.3d 773.

To return to the basics, "[t]o prevail on a [MWPA] claim, an employee must show that (1) he engaged in activity protected by the [M]WPA; (2) that he experienced an adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse employment action." *Galouch*, 2015 ME 55, ¶ 12,

---

[1] USI emphatically makes the general point that Mr. Ruda cannot state a MWPA claim because his concern was a breach of his contract with a former employer as opposed to a breach of his contract with USI. *Def.'s Reply* at 1 ("Plaintiff alleges he was fired for refusing to violate the terms of a non-solicitation agreement with a prior employer, which – as a matter of law – is not actionable under the MWPA"). The Court is not convinced that the law is as simple as USI would have it be. If an employer were to direct its employee to commit a crime, which was also a violation of the employee's agreement with a prior employer, it seems obvious that the MWPA could apply if the employer fired the employee for refusing to obey its directive.

114 A.3d 988 (quoting *Hickson v. Vescom Corp.*, 2014 ME 27, ¶ 17, 87 A.3d 704) (second alteration in original). The dispute here centers on whether Mr. Ruda's revelation of his client contacts at Varney constituted "activity protected by the [M]WPA." *Lee*, 2019 ME 54, ¶ 8 n.3 (citing *Galouch*, 2015 ME 55, ¶ 12, 114 A.3d 988). If so, the complaint sufficiently alleges that Mr. Ruda "experienced an adverse employment action" and that "a causal connection existed" between the activity, if protected, and the adverse employment action. *Id.*

"To satisfy the first element of a [M]WPA claim, the record must establish that [the employee] reported to his employer what he had reasonable cause to believe was his employer's unlawful activity." *See Lee*, 2019 ME 54, ¶ 8 (citing *Galouch*, 2015 ME 44, ¶ 12, 114 A.3d 988). "'The reasonable cause requirement is met only when the employee presents evidence showing she had a subjective belief' that the employer engaged in illegal activity *and* the 'belief was objectively reasonable in that a reasonable person might have believed' illegal activity occurred." *Id.* (quoting *Stewart-Dore*, 2011 ME 26, ¶ 11, 13 A.3d 773) (quotation marks omitted) (emphasis in original). Based on the allegations of the complaint, Mr. Ruda has alleged he had the subjective belief that Mr. Duryee was asking him to do something illegal when he pressed Mr. Ruda for the Varney client names. *Compl.* ¶¶ 22, 25. The inquiry then narrows to whether his "belief was objectively reasonable in that a reasonable person might have believed" that illegal activity occurred. *Id. Lee*, 2019 ME 54, ¶ 8 (quoting *Stewart-Dore*, 2011 ME 26, ¶ 11, 13 A.3d 773).

USI contends that Mr. Ruda's disclosure of the Varney client lists would have been at worst a breach of Mr. Ruda's non-solicitation agreement with Varney, at best no breach at all, and certainly not illegal. Therefore, Mr. Ruda's fear of illegality is something a reasonable person could not have believed and thus not protected under the MWPA.

The Maine Supreme Judicial Court has written that "to satisfy the reasonable cause requirement, the employee must report something other than an ordinary breach of an employment contract to bring himself within the provisions of the Whistleblower Protection Act." *Id.* ¶ 10 (citing *Galouch*, 2015 ME 44, ¶¶ 15-16, 114 A.3d 988; *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 153-54 (Me. 1991)). "A dispute over the interpretation of an employment contract, without more. . .does not constitute a report of illegal activity." *Id.*

In response, Mr. Ruda argues that the Varney client lists that his non-solicitation agreement protected and that USI sought constituted "trade secrets" under the Maine Uniform Trade Secrets Act (MUTSA), 10 M.R.S. § 1543, and the federal Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1839. *Pl.'s Opp'n* at 6-7. In support of his position on the MUTSA, Mr. Ruda cites *Northern Benefits of Maine, LLC v. Mower*, No. CV-14-303, 2014 Me. Super. LEXIS 144, *2-3 (Me. Super. Aug. 5, 2014), which he says holds that misappropriation of trade secrets requires that a "trade secret" in the context of client lists must not be information that is readily accessible by the public. In support of his claim that revelation of the Varney client lists could constitute the revelation of a "trade secret" under the federal DTSA,

Mr. Ruda cites two cases, which he says hold that client lists may qualify as trade secrets. *Id.* (citing *ReBath LLC v. HD Sols. LLC*, 2020 U.S. Dist. LEXIS 223194, *6 (D. Ariz. 2020) and *T&T Mgmt., Inc. v. Choice Hotels Int'l, Inc.*, 2025 U.S. Dist. LEXIS 35126, *15 (D. Minn. Feb. 27, 2025)).

Here, the Court determines that, although USI may ultimately be able to establish that Mr. Ruda did not reasonably believe that the Varney client lists were trade secrets subject to protection under state and federal law, there are too many unanswered factual questions for the Court to rule on this issue in a motion to dismiss.[2]

"As an initial matter, a court examining a claim under the [M]UTSA must determine whether the information at issue constitutes a 'trade secret' as that term is defined in 10 M.R.S. § 1542(4)." *Spottiswoode v. Levine*, 1999 ME 79, ¶ 27, 730 A.2d 166. The MUTSA defines "trade secret" as:

> information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:
>
> A. Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> B. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

[2] An employer and employee may enter into an enforceable restrictive covenant that does not need to be protected as a trade secret under the MUTSA. *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 15, 770 A.2d 97 ("The confidential knowledge or information protected by a restrictive covenant need not be limited to information that is protected as a trade secret by the [M]UTSA"). If Mr. Duryee pressed Mr. Ruda to divulge information subject to a restrictive covenant, but not a trade secret, USI's argument that the MWPA does not apply would be clearer.

10 M.R.S. § 1542(4). "In order for information to qualify as a trade secret, the information must: (1) derive 'independent economic value, actual or potential, from not being generally known [or] readily ascertainable'; and (2) be 'the subject of efforts that are reasonable under the circumstances - to maintain its secrecy.'" *Spottiswoode*, 1999 ME 79, ¶ 27, 730 A.2d 166 (quoting 10 M.R.S. § 1542(4) and citing *Northeast Coating Techs., Inc. v. Vacuum Metallurgical Co.*, 684 A.2d 1322, 1324 (Me. 1996)). In *Bernier v. Merrill Air Engineers*, 2001 ME 17, ¶¶ 28-33, 770 A.2d 97, the Maine Supreme Judicial Court described the five factors for determining whether something is a trade secret as the *Spottiswoode* factors. The five factors are:

> (1) the value of the information to the plaintiff and to its competitors;
>
> (2) the amount of effort or money the plaintiff expended in developing the information;
>
> (3) the extent of measures the plaintiff took to guard the secrecy of the information;
>
> (4) the ease or difficulty with which others could properly acquire or duplicate the information; and
>
> (5) the degree to which third parties have placed the information in the public domain or rendered the information 'readily ascertainable' through patent applications or unrestricted product marketing.

*Id.* ¶ 16 n.6 (quoting *Spottiswoode*, 1999 ME 79, ¶ 27 n.6).

The DTSA defines "trade secret" in relevant part as:

> [A]ll forms and types of financial [and] business . . . information, including . . . compilations, . . . whether tangible or intangible, and whether . . . stored [or] compiled . . . electronically . . . if -- (A) the owner . . . has taken reasonable measures to keep [the] information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

*Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 188 (1st Cir. 2023) (quoting 18 U.S.C. § 1839(3)). As the First Circuit discussion in *Allstate* reveals, whether something is a trade secret under the DTSA involves consideration of such factors as whether the alleged secret (1) is a matter of public knowledge, (2) has independent economic value, (3) the steps the owner of the secret has taken to protect the information, (4) whether the alleged owner is the true owner, and (5) whether the other party misappropriated the information or used improper means to do so. *Id.* at 188-96; *accord ZipBy USA LLC v. Parzych*, 171 F.4th 55, 67 (1st Cir. 2026) (quoting 18 U.S.C. § 1839(3)(A) (discussing whether the holder of the trade secret had taken "reasonable measures to keep such information secret").

Whether customer lists are trade secrets is a matter of debate. *T.H. Glennon Co. v. Monday*, No. 18-30120-WGY, 2020 U.S. Dist. LEXIS 45917, at *42 (D. Mass. Mar. 17, 2020) ("customer lists in general often constitute trade secrets"); *Optos, Inc. v. Topcon Med. Sys.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (holding that a client list was a trade secret even though the company listed their clients on their website as the customer lists contained contract information, fees, and other records that would be difficult to acquire). USI argues that "the issue was not the *identity* of the clients, but a prohibition on *soliciting* those businesses." *Pl.'s Mot.* at 3 (emphasis in original). But here, Mr. Ruda was worried that Mr. Duryee was inquiring about the identity of the clients in order to solicit them.

Under either the Maine or federal formulations, the Court concludes that it cannot, based on the allegations in the complaint alone, fairly determine on a motion

to dismiss whether Mr. Ruda had "reasonable cause to believe was his employer's unlawful activity" when Mr. Duryee repeatedly demanded the Varney client lists. *Lee*, 2019 ME 54, ¶ 8. The resolution of this question must await disposition either during the summary judgment stage or at trial.

USI makes a more general point that Mr. Ruda cannot state a MWPA claim because his concern was a breach of his contract with a former employer as opposed to a breach of his contract with USI, the Court is not convinced. *Def.'s Reply* at 2-3. Setting aside the non-solicitation agreement with Varney, if USI ordered Mr. Ruda to do something that clearly violated the law, it would be a breach of its employment contract with Mr. Ruda, even though the illegal act involved a third person.

**B. Discrimination Claims**

Mr. Ruda alleges that Mr. Duryee was aware he is Jewish because Mr. Ruda had spoken in Mr. Duryee's presence about his upcoming birthright trip to Israel for ten days around New Years Eve 2023-24. *Compl.* ¶¶ 54-54. Following Hamas' October 7, 2023 attack on Israeli citizens attending a music festival, Mr. Duryee said that he could not understand why anyone would want to go to Israel, even though Mr. Duryee knew that Mr. Ruda was going on his birthright trip there. *Id.* ¶ 56. Moreover, Mr. Duryee said in Mr. Ruda's presence, "my Egyptian friend said they [meaning Israelis] deserved to die," because they had been "fucking over" Palestinians "for centuries." *Id.* ¶ 57. Mr. Ruda responded to Duryee that he did not think innocent civilians deserved to die at a music festival. *Id.* ¶ 58. Mr. Ruda considered Mr. Duryee's comments as intentionally demeaning, objectively and

subjectively outrageous, offensive, and deeply humiliating in front of Mr. Ruda's colleagues. *Id.* ¶ 59.

On October 20, 2023, USI placed Mr. Ruda on a list of flagged employees who were not meeting production standards. *Id.* ¶ 60. Mr. Ruda thought that New England Regional Sales Manager Marybeth LaFauci had placed him on the list of flagged employees, but while his claim was before the MHRC, he learned that Mr. Duryee, not Ms. LaFauci, had recommended that Mr. Ruda be placed on the list. *Id.* From that point forward, and in close temporal proximity to him learning of Mr. Ruda's trip to Israel, Mr. Duryee made repeated, escalating efforts to force Mr. Ruda out of USI. *Id.* USI did not terminate Mr. Ruda until May 2024, and he filed his complaint with the MHRC on January 27, 2025. *Id.* ¶ 7.

Both the MHRA and Title VII require that a charge of discrimination be filed within 300 days of the alleged discriminatory act. 5 M.R.S. § 4611 ("a complaint must be filed with the commission not more than 300 days after the alleged act of unlawful discrimination"); 42 U.S.C. § 2000e-5(e)(1) ("such charge shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred . . . "). Mr. Ruda filed a notice of discrimination within 300 days of his May 15, 2024 firing but longer than the events of October 2023.

If the discriminatory act was Mr. Duryee's provocative and insensitive comments about the October 7, 2023 atrocity or his being listed on the flagged employee list, the claims would be barred because he gave his January 27, 2025 notice well after 300 days from these actions. *Andersen v. Dep't of Health and Human*

*Servs.*, 2025 ME 25, ¶ 25, 340 A.3d 41; *Ayala v. Shinseki*, 780 F.3d 52, 56 (1st Cir. 2015) (if a notice of claim is not filed within 300 days, "discrete discriminatory acts will be time-barred, and thus not actionable, even if they are related to acts alleged in timely filed charges").

To avoid dismissal, Mr. Ruda asserts that the October 2023 comment was only the beginning of a continuing violation of his rights, which he says blossomed into his termination in May 2024. "Courts have recognized a narrow exception to the limitations period via the 'continuing violation doctrine.'" *Ayala*, 780 F.3d at 57 (citing *Pérez-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008)). "Under the 'continuing violation' doctrine, a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period." *Id.* (citing *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009)).

The seminal case is *AMTRAK v. Morgan*, 536 U.S. 101 (2002), where the United States Supreme Court addressed the continuing violation exception. In *Morgan*, the Supreme Court explained that "[h]ostile environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct." *Id.* at 115. A hostile work environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.*

In *Andersen*, the Maine Supreme Judicial Court wrote:

> Whether an individual event can constitute part of a continuing violation depends on three factors: "1) whether the within and without

> statute of limitations harassment involve the 'same type of employment actions'; 2) whether they occurred 'relatively frequently'; and 3) whether they were 'perpetrated by the same managers.'"

2025 ME 59, ¶ 27, 340 A.3d 41 (quoting *Morgan*, 536 U.S. at 120).

Turning to Mr. Ruda's complaint, the following allegations appear regarding his continuing violation theory:

> 72. Based on the timing of events described above, Ruda's practice of his Jewish faith was the basis for the adverse employment actions taken by USI, beginning on October 20, 2023 and escalating until the time of his termination on May 14, 2024.
>
> 73. Beginning with discriminatory and anti-Jewish comments and continuing through the time that Duryee placed Ruda on a false and pretextual PIP, USI committed serial violations of Title VII's prohibition against religious discrimination.

*Compl.* ¶¶ 72-73.

As is apparent, these allegations fall far short of what the United States Supreme Court, the Court of Appeals for the First Circuit, and the Maine Supreme Judicial Court have required to state a continuing violation theory. The allegations are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," and therefore "the complaint is open to dismissal." *Tambone*, 597 F.3d at 442.

The Court concludes that Counts II, III, and IV are barred by Mr. Ruda's failure to give timely notice under 5 M.R.S. § 4611 and 42 U.S.C. § 2000e-5(e)(1).

## VI. CONCLUSION

The Court GRANTS in part and DENIES in part Defendant's Motion to Dismiss (ECF No. 5). The Court GRANTS Defendant's Motion to Dismiss Counts II,

III and IV and DENIES Defendant's Motion to Dismiss Count I of Plaintiff's complaint.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 17th day of August, 2026